```
             IN THE UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF DELAWARE

In re:                              :    Chapter 11
                                    :
SOUTHEASTERN GROCERS, LLC, et al.,  :    18-10700 (MFW)
                                    :
         Debtor.                    :
                                    :    Re Docket Nos. 639, 648
```

**MEMORANDUM OPINION[1]**

Before the Court is the issue of what constitutes Gross Sales under leases for two stores operated by the Debtors (or Reorganized Debtors) for purposes of the calculation of percentage rent under the Leases.  The Debtors contend that the term includes only the net revenues they receive from certain ancillary services that they allow at their stores while the Landlords contend that the term includes the gross revenues generated by those services, even though the Debtors pass on the vast majority of those revenues to others.  For the reasons set forth below, the Court concludes that the plain language of the Leases mandates that the Debtors pay percentage rent based on the total gross revenues for the ancillary services.

I.   JURISDICTION

The Court has jurisdiction over this core adversary proceeding, which deals with the calculation of claims against

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is incorporated by reference in Rule 9014.

the estate.  28 U.S.C. §§ 157(b)(2)(B) & 1334.  The parties are deemed to have consented to the Court entering a final order.  See Del. Bankr. L. R. 9013-1.[2]  Wellness Int'l Network v. Sharif, 135 S. Ct. 1932 (2015) (finding that parties' consent permits a bankruptcy judge to enter a final order or judgment on a claim).

II.  FACTUAL BACKGROUND

On March 27, 2018, Southeastern Grocers, LLC and several of its affiliates filed voluntary petitions under chapter 11 of the Bankruptcy Code.  The filing was preceded by the negotiation of (and voting on) a Plan of Reorganization pursuant to which the Debtors' balance sheet would be restructured, reducing funded debt by approximately $500 million and annual debt service obligations by approximately $40 million.  As of the petition date, 68% of the Unsecured Noteholders and 99% of the existing equity (the only classes impaired and entitled to vote) had voted in support of the pre-packaged plan.  The Debtors filed the plan on March 27 and a confirmation hearing was scheduled for May 14, 2018.

---

[2] The Local Rules require parties in a contested matter to include a statement that the pleader "does or does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. If no such statement is included, the [pleader] shall have waived the right to contest the authority of the Court to enter final orders or judgments." Del. L.R. 9013-1(f) & (h).

The Debtors' pre-packaged plan contemplated the sale or rejection of unprofitable store locations "to ensure the Debtors' viability and profitability going forward" and the assumption of the other stores. (D.I. 3 at ¶ 6.) In response to the Debtors' Notice of Assumption of Leases, Commodore Realty, Inc. ("Commodore"), as the property manager for the Landlords at Store Nos. 328 and 2448 filed an objection. (D.I. 266.) In that objection, Commodore contended that the lease for Store No. 328 (the "Tavernier Lease") had been terminated pre-petition for failure to accurately report gross sales and to pay the percentage rent due thereon. It also contended that the lease for Store No. 2448 (the "Palmetto Lease") was in default for the same reason. Commodore also filed an objection to confirmation of the Debtors' Plan for the same reasons.

The Debtors filed an Amended Plan of Reorganization on April 25, 2018, which made certain technical amendments to the pre-packaged plan. (D.I. 383.) The Amended Plan provided in relevant part that leases which are subject to a dispute about whether they can be assumed (or the proper cure amount due on assumption) would not be assumed until the dispute was resolved.

At the confirmation hearing, the Court directed that the parties agree to a scheduling order for briefing on the issues. An order was entered by the Court on June 18 and a notice of

completion of briefing was filed on August 8, 2018.  The matter is ripe for decision.

III. <u>DISCUSSION</u>

The dispute with respect to both leases is the calculation of Gross Sales (on which percentage rent is calculated).  The issue is whether Gross Sales include the total paid by customers for certain ancillary services offered by the Debtors in their stores or only the amount of fees which the Debtors actually receive for allowing those services to be provided in the stores. The "Store Services" which are at issue include (i) Western Union services, (ii) Rug Doctor services, (iii) Coinstar machines, (iv) sale of State of Florida Lottery tickets, (v) Redbox dvd machine rentals, (vi) Glacier/Primo water cooler exchanges, (vii) fees for handling manufacturer coupons, (viii) the sale of gift or phone cards, (ix) check cashing services, (x) ATM transactions, and (xi) sale of compacted cardboard boxes to a cardboard vendor.

Commodore contends that the gross amount of funds generated by those services must be included under the plain language of the leases.  The Debtors argue that those service revenues are not to be included in its gross rent calculation because it receives only a small fee for those services, with the bulk of the revenues going to others.  For example, the Debtors contend that it would be absurd to include in its gross sales the face

4

value of funds wired through Western Union when it never receives those funds, but only receives a commission for allowing that service.  Commodore argues that inclusion of the Store Services gross receipts is no different from requiring the Debtors to report the gross sales revenues from the sale of their merchandise, even though they do not keep the gross revenues but must deduct the cost of the goods and other expenses before realizing a profit.

A decision requires the interpretation of the lease terms. The Tavernier Lease defines Gross Sales as "the aggregate gross sales price of all merchandise sold, and gross charges for all services rendered in or from the demised premises, both for cash or on credit."  (D.I. 469, Ex. 1A at Art. 1a.)  The Tavernier Lease also provides that if the Debtors sublease a portion of their premises "the sales of such concessionaire or licensee shall be included withi [sic] the gross sales of [the Debtors]." (D.I. 469, Ex. 1A at Art. 26.)

The Palmetto Lease contains similar language.  Gross Sales "shall be construed to include the entire amount of the actual sales price, whether for cash or otherwise, of all sales of merchandise and other receipts whatsoever of all business conducted in, on or from the demised premises, and sales by any sublessee, concessionaire, or licensee or otherwise in said premises."  (D.I. 469, Ex. 2A at Sec. 5.)

The Court concludes that the leases are unambiguous and that the definition of Gross Sales under both include the total revenues from the Store Services that the Debtors contend should be excluded. Both leases define Gross Sales to include the gross amount realized from the sale of goods or provision of services (whether done by the Debtors or others) on the leased premises. The Store Services fit within that broad definition.

IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the Gross Sales calculation in both the Tavernier and Palmetto Leases must include the gross revenues generated by the Store Services.

An appropriate Order is attached.

Date: September 6, 2018        BY THE COURT:

*[signature]*

Mary F. Walrath
United States Bankruptcy Judge